```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION
```

Richard Owens,                    :

     Plaintiff,                 :

  v.                              :       Case No. 2:13-cv-1223

                                           :       JUDGE GREGORY L. FROST
Commissioner of Social Security,          Magistrate Judge Kemp

     Defendant.                 :


## REPORT AND RECOMMENDATION

### I.  Introduction

    Plaintiff, Richard Owens, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits. That application was filed on November 4, 2010, and alleged that Plaintiff became disabled on October 2, 2008.

    After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on May 2, 2012. In a decision dated August 13, 2012, the ALJ denied benefits. That became the Commissioner's final decision on October 11, 2013, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on February 7, 2014. Plaintiff filed his statement of specific errors on March 27, 2014, to which the Commissioner responded on July 17, 2014. No reply has been filed, and the case is now ready to decide.

### II.  Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 38 years old at the time of the administrative hearing and who has a GED and an Associates Degree, testified as follows. His testimony appears at pages 37-

65 of the administrative record.

Plaintiff last worked in October, 2008, when he suffered a job-related injury.  He was getting workers' compensation benefits at the time of the hearing.  He had been working as a fence installer.  Other past jobs included day laborer, construction worker, telephone solicitor, project director, and cashier at a gas station.

The injury Plaintiff suffered was to his back, caused by a roll of metal fencing falling on him.  He experienced a crush injury at L4-5.  He also had permanent nerve damage in his left leg.  These injuries affected his ability to sit, stand, and walk.  He could not lift and carry objects because he used a walker.  He underwent surgery in 2010, which involved a spinal fusion, and had a second surgery in 2011, during which some hardware was repaired and a build-up on the bone was removed.  His surgeon has recommended a third surgery to address the nerve damage in his left leg.

Plaintiff testified that his surgeon, Dr. Todd, had restricted his lifting to five to ten pounds.  Also, he was not to stoop or bend and was not to stand for more than fifteen or twenty minutes.  Plaintiff was also instructed to wear his back brace at all times and to use either a walker or a cane, both of which were doctor-prescribed.  Plaintiff said that his pain medications helped somewhat and that he did not have side effects from them.

In a typical day, Plaintiff got up early because he was unable to sleep for more than two hours.  He took medication and ate, and then watched television, either sitting or lying down.  He moved around from the living room to the bedroom and from couch to recliner.  He had a caretaker living with him.  He was not able to dress himself and needed help with showering, getting up from a chair, and getting in and out of vehicles.  Due to

muscle spasms, he was at risk of falling. He did no cooking or shopping and no household chores.

Plaintiff also testified to some psychological issues including depression and not wanting to be around people. He was seeing a psychiatrist but could not take antidepressants due to other medication he took. He did not leave the house other than for doctors' appointments. His back pain interfered with his concentration. He also had pain radiating into his left leg all the way to his heel, and he also experienced coldness in his leg. Walking, even with a walker, was painful. He had tried other methods to reduce his pain, like ice and heat, and they were ineffective.

Plaintiff was asked how much total time he could spend walking during an eight-hour workday in September, 2009. He estimated about 45 minutes. He could also have stood for 30 to 45 minutes, but no more than three to five minutes at a time. He could not have sat for more than two hours total and could not drive.

### III. The Medical Records

The medical records in this case are found beginning on page 277 of the administrative record. The pertinent records - those relating to Plaintiff's physical condition, since that is the only condition pertinent to his statement of errors can be summarized as follows.

Plaintiff did obtain emergency room treatment at the Holzer Medical Center when the industrial accident occurred (which was in early October, 2008). Shortly after the accident, Plaintiff had an MRI done, based on his complaints of pain and weakness, coupled with an episode of urinary incontinence. The study showed only mild or minimal changes in the lower back with mild left L5-S1 neural foraminal stenosis. At that time, Dr. Popper indicated that Plaintiff was in a "no work status." (Tr. 279-

80).

Plaintiff saw Dr. Mehta for pain management in January of 2009.  Dr. Mehta reported that Plaintiff's "symptoms greatly outweigh objective findings" and that although Plaintiff might truly have pain, Dr. Mehta could not identify a specific cause. The exam was described as "very inconsistent" and Dr. Mehta thought some nonorganic factors might be present. (Tr. 376-77).

Dr. Holzapfel examined Plaintiff for the Bureau of Workers Compensation in May, 2009.  Dr. Holzapfel concluded that Plaintiff did not need more treatment for his industrial injury, which he described as "sprains of the left shoulder, neck, thoracic spine, and lumbar spine," and he thought Plaintiff was able to work at a sedentary occupation so long as he did not have to stand for more than an hour at a time, lift above shoulder height with his left arm, or do any stooping, squatting, kneeling, or bending.  He also thought Plaintiff was ready for vocational rehabilitation.  (Tr. 368-71).

Dr. Todd, who had been seeing Plaintiff for his back condition, wrote a letter dated October 26, 2009, in which he noted that injections and physical therapy had not afforded Plaintiff any lasting relief.  During the October visit, Plaintiff walked with a narrow-based gait.  Dr. Todd stated that the physical examination was essentially unchanged from March, when Plaintiff had range of motion restrictions, an inability to toe or heel walk on the right side, and positive straight leg raising on the right (but not on the left).  Dr. Todd's impressions included disc protrusion at L5-S1 and, to a lesser degree, at L4-5, mild disc protrusion at C5-6, and cervical and lumbar sprain.  The Bureau of Workers' Compensation had approved a discogram so that was going to be done.  Plaintiff did report worsening symptoms since the last time he was seen by Dr. Todd. (Tr. 329-30, 373-75).  After the discogram, Dr. Todd recommended

surgery.

The records also include a report done by Dr. Bridger for the BWC. In that report, dated February 13, 2010, Dr. Bridger stated that Plaintiff had been unable to work since the date of his accident and that the discogram had been performed and confirmed that Plaintiff's neurologic pain was related to his accident. (Tr. 334-35). Dr. Popper wrote a letter at about the same time supporting a request for approval of lumbar fusion surgery, also confirming that the discogram was "positive from L4 to S1" and that the bulging or degenerated discs were causing pain. (Tr. 337-38). Shortly before that, Plaintiff was evaluated by Dr. Rutherford for the BWC, who reported that Plaintiff's subjective claims included losing his balance all the time and having a constant "electrical" pain radiating down both legs but worse on the left. Plaintiff also said he could not sit for more than an hour and experienced difficulty in climbing the three steps up to his house. On examination, Plaintiff walked with a cane and limped on the left side. He could not stand on his toes or heels. He showed restriction on the range of motion in his lower back and he had tenderness in the back and legs as well as some sensory loss in the left leg. Straight leg raising was positive bilaterally. Dr. Rutherford did not think that Plaintiff had reached maximum medical improvement and said that Plaintiff was still unable to return to work. He was not, at that time, a candidate for vocational rehabilitation. (Tr. 339-42). However, an emergency room report from February 7, 2010, showed Plaintiff walking normally and quickly, carrying his cane, and getting on and off of an examination table without any difficulty. That occurred after Plaintiff reported pain so severe he could barely move. Plaintiff was not given any narcotic pain medication. (Tr. 392-94). Prior notes from physical therapy reported that plaintiff was not particularly

compliant with therapy and engaged in "symptom exaggeration behavior." (Tr. 558-59).

Dr. Todd performed surgery on Plaintiff in June, 2010, which involved a laminectomy and fusion with instrumentation from L4 to S1. Three months later, Plaintiff was still reporting significant back and leg pain. Dr. Todd recommended an epidural injection to be followed by physical therapy. He also noted that during the surgery he observed severe neural encroachment. (Tr. 997-98).

Plaintiff was still having problems nine months after surgery, and another surgery was discussed. (Tr. 1026-27). At 14 months post surgery, some of the hardware had failed, causing additional pain. The failure may have been caused by a motor vehicle accident which occurred in August, 2011. Plaintiff underwent a second surgery on November 1, 2011 to replace the hardware and to repeat the fusion. Later studies showed good fusion and alignment of the hardware, but Plaintiff still complained of uncontrolled pain.

There are quite a number of office notes from Dr. Popper, and he also filled out monthly forms for BWC. During the relevant time frame, he consistently indicated that Plaintiff could not work. He did not specifically state whether Plaintiff was unable to return to his past job or unable to perform any job at all, and his reports did not include any specific limitations of function.

Finally, state agency physicians reviewed Plaintiff's claim. Dr. McCloud, in an opinion dated February 2, 2011, stated that through his last insured date, Plaintiff could do a full range of medium work. (Tr. 79). Dr. Perencevich, who reviewed Dr. McCloud's findings, limited Plaintiff to a full range of light work. (Tr. 87-88).

### IV. The Vocational Testimony

Dr. Lanier was the vocational expert in this case. His testimony begins on page 65 of the administrative record.

Dr. Lanier categorized Plaintiff's past work in terms of skill and exertional level. He said that the day laborer job was heavy and semiskilled; the construction worker job was very heavy and unskilled; the telephone solicitor position was sedentary and semi-skilled; the tractor-trailer driver was medium and semi-skilled; the project director job was skilled and sedentary; and the gas station cashier job was semiskilled and light.

Dr. Lanier was first asked if someone who had the limitations to which Plaintiff testified could work. He did not believe so. He was then asked some questions about employee absenteeism and breaks, and responded that for the first 30 days of employment, no absences would be tolerated, and then one to one-and-one-half days per month would be permissible. In terms of breaks, an unskilled worker would have to stay on task 90 to 95 percent of the time other than during lunch and regularly-scheduled work breaks. Dr. Lanier was not asked to give any other testimony.

## V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 11-25 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff last met the insured status of the Social Security Act on September 30, 2009. Second, Plaintiff had not engaged in substantial gainful activity from his onset date of October 2, 2008 through his last insured date. As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including cervical and lumbar degenerative disc disease, a history of left shoulder sprain/strain, and obesity. The ALJ also found that these impairments did not, at

any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary exertional level but he could not lift above shoulder height on the left side and could stoop, squat, kneel, and bend only occasionally. The ALJ found that, with these restrictions, Plaintiff could not perform his past relevant work. Under the medical-vocational guidelines, if Plaintiff could do a full range of sedentary work, he would be deemed not to be disabled. The ALJ found that the restrictions limiting Plaintiff's ability to do sedentary work would not significantly erode the sedentary work base, so that even though Plaintiff's condition did not exactly track the grid, he was still able to do most sedentary work. Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI. Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not properly evaluate the opinions of the treating physician, Dr. Popper; (2) the ALJ did not properly evaluate medical evidence about Plaintiff's condition which post-dated the expiration of his insured status; (3) the ALJ did not consider all of Plaintiff's severe impairments; (4) the ALJ did not properly consider Section 1.04 of the Listing of Impairments; and (5) the ALJ did not correctly utilize the vocational expert's testimony. The Court analyzes these claims under the following standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is

"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Dr. Popper's Opinions

Plaintiff's first argument is that the ALJ did not give appropriate weight to Dr. Popper's opinions. In particular, he identifies opinions about his ability to return to work, to which the ALJ gave no weight, and his ambulatory limitations, which the ALJ did not accept. He contends that the ALJ had no basis for concluding that Dr. Popper's monthly disability reports were limited to Plaintiff's ability to return to his past work, and that the ALJ disregarded significant evidence of gait abnormalities in concluding that Dr. Popper's prescription of a cane was not based on any evidence of record.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight

substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(c); see also Lashley v. Secretary of HHS, 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision.  Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

    Here, the ALJ provided this rationale for weighing Dr. Popper's opinions as he did.  First, he pointed out that in the monthly forms which Dr. Popper completed for the BWC, "he identified no specific functional limitations."  (Tr. 22).  He also determined that Dr. Popper's statements could "be read to mean that the claimant could not return to his past work as a fence installer."  Id.  The ALJ concluded by noting that Dr. Popper never said that Plaintiff could perform no work at all; had he done so, the evidence - specifically Dr. Holzapfel's opinion, which was "[t]he only other medical opinion made during the relevant period" - would not have supported that conclusion.  Finally, the ALJ relied on the objective findings made during Dr.

-10-

Holzapfel's examination, which were minimal, and other evidence such as inconsistent examination findings and a strong suggestion of non-organic factors causing Plaintiff to describe his symptoms in the way that he did.  (Tr. 22-23).

   The Commissioner correctly defends the ALJ's conclusion that the "opinions" expressed by Dr. Popper were either not medical opinions at all or were opinions on an issue reserved to the Commissioner.  20 C.F.R. §404.1527(a)(2) defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  Simply saying that someone "cannot work" or "is disabled" does not satisfy this definition.  Further, "[t]he degree to which an individual is capable of performing work is an issue reserved to the Commissioner."  Dixon v. Colvin, 2014 WL 3547378, *9 (S.D. Ohio July 17, 2014), citing, inter alia, Bass v. McMahon, 499 F.3d 506, 511 (6th Cir. 2007).  Finally, given that Dr. Popper was reporting his conclusions to the BWC, and the issue for that entity was whether Plaintiff could return to his past work, a reasonable person could have concluded, as did the Commissioner, that Dr. Popper limited his views to that issue and expressed no opinion about whether Plaintiff could perform some hypothetical sedentary job.

   On the separate issue of Dr. Popper's decision to prescribe a cane for Plaintiff, the Court also finds, for the reasons advanced by the Commissioner, that the ALJ did not have to accept the proposition that Plaintiff could not walk without one. Again, there is sparse or conflicting medical evidence about his ability to walk without assistance, and it is the ALJ's job to resolve such conflicts.  See, e.g., Swett v. Comm'r of Social Security, 886 F.Supp.2d 656, 660-61 (S.D. Ohio 2012).  Further,

-11-

as more fully discussed below, any error in this regard is harmless given the ALJ's residual functional capacity finding limiting Plaintiff to sedentary work.  For all these reasons, the Court finds no reversible error in the ALJ's consideration of Dr. Popper's opinions.

          B.   <u>Medical Evidence after the Last Insured Date</u>

    Plaintiff's second argument is that the ALJ improperly discounted or ignored evidence of the treatment which Plaintiff received after the expiration of his insured status.  Plaintiff claims that nothing exacerbated his condition between his last insured date and the date of later objective testing, including Dr. Todd's surgical findings, so that the later evidence was probative of his condition on the last insured date.  Despite that, he asserts that the ALJ reviewed it only briefly and that the case should be remanded for further consideration of that evidence.

    The Commissioner responds by disputing the factual premise of this argument.  In the opposing memorandum, the Commissioner cites to various portions of the ALJ's decision which refer to or discuss the evidence relating to Plaintiff's condition after his last insured date.  The Commissioner is correct on this point; the ALJ devoted more than a full page of his decision to a detailed summary of this evidence.  What Plaintiff seems to argue is that the ALJ did not give this evidence enough weight, especially on the issue of whether there was objective medical support for some of the symptoms Plaintiff was reporting during the insured period.  This argument, again, asks the Court to reweigh the evidence even though a reasonable person could have, on the basis of the entire record - including the opinions of state agency reviewers who had the benefit of some or all of the post-2009 records - concluded that Plaintiff retained the ability to work at some level.  The ALJ did not make a legal error here; he did not decide, for example, that none of the post-2009

evidence was relevant or that he could not take the relevant portions of it into consideration.  Since this is simply a disagreement about how much weight should be ascribed to these records, it does not provide a basis for the Court to reverse the ALJ's decision.

### C.  Other Severe Impairments

Next, Plaintiff contends that the ALJ did not adequately account for other severe impairments which the record establishes.  He specifically cites to evidence of functional limitations from his cervical sprain and strain which were not factored into the ALJ's residual functional capacity finding, as well as such conditions as muscle spasms, disc pathology, foraminal stenosis, disc protrusions, and pseudoarthrosis.  Since these impairments caused additional limitations, he claims that the ALJ erred by not finding that any of them were severe.

Plaintiff concedes that if the ALJ took limitations arising from nonsevere impairments into account in crafting his residual functional capacity finding, any error in determining that a particular impairment was not severe is harmless.  See Statement of Errors, at 27; see also Pompa v. Comm'r of Social Security, 73 Fed. Appx. 801, *1 (6th Cir. Aug. 11, 2003).  His argument is that, in fact, the ALJ did not do so, based on his claim that "the [ALJ's} decision provides no discussion regarding the severity of these impairments."  Statement of Errors, supra.  The question then becomes whether the ALJ adequately accounted for Plaintiff's various impairments in arriving at his conclusion about Plaintiff's residual functional capacity.

Most of the "impairments" which Plaintiff identifies are actually associated with his low back disorder, and are not really separate impairments at all.  Muscle spasms and disc pathology, for example, are either symptoms of degenerative disc disease or an alternate way to describe that condition.  Further, Plaintiff is simply incorrect when he states that the ALJ

considered no evidence beyond that which supported a finding of degenerative disc disease.  The ALJ thoroughly recited the findings from various diagnostic studies, and made specific reference to matters like musculoskeletal spasms (Tr. 18), spinal canal stenosis (Tr. 15), and mild canal and bilateral foraminal narrowing (Tr. 18).  As the Commissioner notes, the ALJ also discussed Plaintiff's reports of pain consistently throughout his decision.  Plaintiff has not actually identified what additional restrictions, beyond those found by the ALJ, resulted from the other impairments shown by the evidence; impairments by themselves, of course, do not suggest any particular physical limitations, and the task of formulating a residual functional capacity finding is focused on limitations rather than impairments.  Cf. Boston v. Astrue, 2011 WL 4914759,*9 (S.D. Ohio Sept. 15, 2011)(an ALJ is required "to assess the medical evidence to determine not whether Plaintiff has [a specific impairment], but what limitations she suffers as a result and to include those functional restrictions in the RFC assessment"), adopted and affirmed 2011 WL 4914939 (S.D. Ohio Oct. 17, 2011).  For these reasons, the Court finds no merit in Plaintiff's argument on this point.

### D.  Listing 1.04

As his fourth statement of error, Plaintiff argues that the ALJ - although he found that Plaintiff's impairments did not meet or equal the requirements of any section of the Listing of Impairments - did not actually perform that analysis.  Plaintiff asserts that the ALJ "missed" the evidence showing that, before the expiration of his insured status, Plaintiff had many of the symptoms described in Section 1.04(A), including radiculitis, weakness, impaired ambulation, positive straight-leg raising, severe neural encroachment, disc bulging, foraminal stenosis, and pseudoarthrosis.  Had the ALJ properly considered this evidence, Plaintiff contends that a finding of "disabled" would have been

made.

Section 1.04 of the Listing of Impairments relates to various disorders of the spine.  It directs a finding of disability if a claimant has one of those disorders - which Plaintiff does - and if there is, in the words of subsection (A), "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)...."  At Tr. 20, the ALJ specifically referred to this section, finding that the medical evidence did not show the presence of the symptoms required under either subsection (A) or the other two subsections of Listing 1.04.  Plaintiff appears to be criticizing the ALJ for not including, in that section of the administrative decision, his rationale for reaching that conclusion.,

Again, as the Commissioner points out, the ALJ engaged in a thorough discussion of the evidence in the section of his decision immediately preceding his analysis of the Listing issue.  Clearly, he was aware of the extensive and sometimes conflicting evidence as to various aspects of the requirements of Section 1.04(A), and, as the Commissioner argues, had a substantial basis for finding that not all of these requirements were satisfied, at least prior to the expiration of Plaintiff's insured status.  The results of straight-leg testing varied, sometimes being positive on one side, sometimes bilaterally, and sometimes only in one position rather than another.  The evidence concerning motor loss or atrophy and associated sensory or reflex loss was equivocal.  And there were diagnostic studies which did not show nerve root compression.  The real question here is not the adequacy of the ALJ's articulation of a rationale in the section of his decision devoted to Section 1.04, but whether the conclusion he reached

was supported by substantial evidence and whether the record supports an inference that the ALJ was aware of and considered the pertinent evidence as part of his decision-making process. It does, and the evidence allowed a reasonable person to find that all of the requirements of Section 1.04(A) were not met. That is sufficient to sustain the ALJ's decision on this issue even if the articulation of his rationale was less than optimal. See Bledsoe v. Barnhart, 165 Fed.Appx. 408, 411 (6th Cir. Jan. 31, 2006)(noting that the "argument that the ALJ should spell out the weight he gave to each factor in his step three analysis is not supported by case law"); Lee v. Comm'r of Social Security, 2013 WL 6116814, *7 (N.D. Ohio Nov, 20, 2013)("The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis").

       E. <u>The Vocational Testimony</u>

  Lastly, Plaintiff points out that the residual functional capacity finding made by the ALJ was never incorporated into the questions posed to the vocational expert.  He contends that it is not clear from the record that, with the additional restrictions found by the ALJ in addition to those inherent in limiting Plaintiff to sedentary work, there would have been any jobs Plaintiff was able to perform.  He also faults the ALJ for accepting Dr. Holzapfel's opinion about Plaintiff's capabilities, arguing that Dr. Holzapfel limited his statements to limitations caused by Plaintiff's allowed conditions and not his overall physical condition, and that other evidence demonstrated more substantial restrictions.

  The primary thrust of this argument is that the ALJ did not have a substantial basis for finding that Plaintiff could do a wide range of sedentary work without testimony from a vocational expert to that effect.  There are some cases where expert testimony is mandatory and use of the Medical-Vocational Guidelines ("grid") is not permitted.  That is, "the grid only

-16-

applies if the individual is capable of performing a wide range of jobs at the designated level-i.e., sedentary, light or medium." Kirk v. Secretary of HHS, 667 F.2d 524, 529 (6th Cir. 1981). Nevertheless, vocational testimony is not required in every case where a claimant's functional restrictions do not match the grid precisely; for a claimant "whose impairments do not precisely match any specific rule, [the claimant's] residual functional capacity ... is used as the appropriate framework to determine whether she is disabled." Wright v. Massanari, 321 F.3d 611, 615 (6th Cir. 2003). However, when non-exertional impairments are present which preclude the performance of a wide range of work at any particular exertional level, the Commissioner must use vocational testimony in order to satisfy the step five burden of showing that jobs which the claimant can perform exist in significant numbers in the economy; "if a claimant suffers from a limitation not accounted for by the grid, the Commissioner may use the grid as a framework for her decision, but must rely on other evidence to carry her burden." Wilson v. Comm'r of Social Security, supra, at 548.

    Here, the ALJ determined that Plaintiff could work at the sedentary level but had restrictions in stooping, squatting, kneeling, bending, and reaching above shoulder height on the left side. He then relied on certain Social Security Rulings for the proposition that sedentary work typically does not involve more than occasional stooping, bending, or crawling. For example, SSR 85-15 states that "[i]f a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact" and "[t]his is also true for crouching." Further, "crawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world or work." Id. SSR 96-9p states that "[p]ostural limitations or

restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work."

Reliance on these regulations was permissible.  The findings in SSRs have been deemed to be substantial evidence which supports an ALJ's conclusions about the extent to which certain postural or other limitations erode the sedentary work base. See, e.g., Edwards v. Comm'r of Social Security, 2012 WL 6962977, *9 (E.D. Mich. Dec. 17, 2012), adopted and affirmed 2013 WL 363018 (E. D. Mich. Jan. 30, 2013); see also Riley v. Comm'r of Social Security, 2013 WL 1278344, *9 (E.D. Mich. Feb. 22, 2013), adopted and affirmed 2013 WL 1278492 (E.D. Mich. March 27, 2013) (finding "no error in the ALJ's reliance on SSR 85-15 to conclude that plaintiff's nonexertional limitations did not significantly erode the occupational base").  As the court said in Goble v. Comm'r of Social Security, 2012 WL 832356 (N.D. Ohio March 9, 2012), a case which also involved reliance on SSR 85-15,  "the ALJ's decision ... that [Plaintiff] did not suffer from any nonexertional limitations that would significantly erode the occupational base of unskilled light work and preclude the use of the grid to determine disability are supported by the record and in accordance with the proper legal standards."  Thus, the ALJ was not required to obtain vocational testimony in this case.

The ALJ also found that Plaintiff was not required to use a cane - a finding which has substantial support in the record - but even if he did, that would not significantly erode the sedentary work base.  SSR 96-9p also discusses this issue, stating that "if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly

-18-

eroded" and noting that "[s]ince most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand."  While this does not completely answer the question of whether, if Plaintiff did need a cane, he could still perform a substantial number of jobs - SSR 96-9p says only that this "may" be the case - it does provide some support for the ALJ's decision.  If the evidence more directly supported the need to use a cane whenever Plaintiff was required to stand or walk, this might be a closer case, but the evidence is not so one-sided.  Overall, the Court finds no error in the ALJ's use of the SSRs as opposed to vocational testimony at step five, nor was the ALJ precluded from using Dr. Holzapfel's findings as a guide to determining Plaintiff's residual functional capacity.  Those findings were more restrictive than the ones imposed by either state agency physician, and the ALJ properly credited Dr. Holzapfel's opinion and certain aspects of Plaintiff's testimony in determining that Plaintiff was limited to a wide range of sedentary work.  Consequently, there is no merit in Plaintiff's fifth claim of error.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in this case in favor of the Defendant Commissioner of Social Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those

specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a _de novo_ determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

     The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation _de novo_, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

                                          /s/ Terence P. Kemp
                                          United States Magistrate Judge